**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **JOHN RICHARD HENDERSON,** | § | |
| **Individually And On Behalf of Similarly** | § | |
| **Situated Individuals,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:16-CV-01761** |
| | § | |
| **WOODGRAIN MILLWORK, INC. d/b/a** | § | |
| **WOODGRAIN DISTRIBUTION,** | § | |
| | § | |
| **Defendant.** | § | |

---

**DEFENDANT WOODGRAIN'S MOTION FOR SUMMARY JUDGMENT**

---

Kimberly R. Miers
Texas State Bar No. 24041482
kmiers@littler.com
Russell R. Zimmerer
Texas State Bar No. 24059798
rzimmerer@littler.com

Littler Mendelson, P.C.
A Professional Corporation
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, TX  75201.2931
214.880.8100
214.880.0181 (Fax)

ATTORNEYS FOR WOODGRAIN
WOODGRAIN MILLWORK, INC. d/b/a
WOODGRAIN DISTRIBUTION

TABLE OF CONTENTS

PAGE

I.   SUMMARY OF THE ARGUMENT ................................................................ 1

II.  STATEMENT OF FACTS ............................................................................. 2

     A.   Defendant Woodgrain Distribution............................................................ 2

     B.   Plaintiff's Employment as Truck Drivers ................................................. 2

     C.   Woodgrain's Interstate Distribution Operations ..................................... 5

     D.   The Specific Plaintiffs............................................................................ 7

III. SUMMARY JUDGMENT STANDARD......................................................... 8

IV.  ARGUMENT AND AUTHORITIES ............................................................... 9

     A.   Plaintiffs Are Exempt from the Overtime Provisions of the FLSA Pursuant
          to the Motor Carrier Act Exemption of Section 213 (b)(1). ................... 9

     B.   Woodgrain Is a Motor Carrier............................................................... 11

     C.   Plaintiffs Were Drivers Who Directly Affected Highway Safety. ...................... 12

     D.   Plaintiffs Transported Goods in Interstate Commerce....................................... 13

          1.   Woodgrain controls the products and owns the distribution center........ 14

          2.   Woodgrain's orders are based on historical data and
               understandings with the customers. ....................................................... 15

          3.   Woodgrain's products have a quick turnaround time from
               warehouse delivery to customer delivery. .............................................. 16

          4.   The products are still in interstate commerce even though there is
               no storage-in-transit provision. ............................................................. 18

V.   CONCLUSION........................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................8

*Badgett v. Rent-Way*,
  350 F. Supp. 2d 642 (W.D. Pa. 2004).....................................................13

*Barefoot v. Mid-Am. Dairymen, Inc.*,
  826 F. Supp. 1046 (N.D. Tex. 1993) *aff'd*, 16 F.3d 1216 (5th Cir. 1994)...................9, 10, 12

*Billings v. Rolling Frito-Lay Sales, L.P.*,
  413 F. Supp. 2d 817 (S.D. Tex. 2006) ........................................ *passim*

*Bradford, et al., v. GG Distrib., LLC*,
  No. 2:14-CV-692- RSP, 2016 WL 951762 (E.D. Tex. Mar. 12, 2016)......................10, 15, 18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................................8

*Collins v. Heritage Wine Cellars, Ltd.*,
  No. 07-cv-1246, 2008 WL 5423550 (N.D. Ill. Dec. 29, 2008)................16

*Douglass v. United Servs. Auto. Ass'n*,
  79 F.3d 1415 (5th Cir. 1996) (en banc) ...................................................9

*Edwards v. Aramark Uniform & Career Apparel, LLC*,
  2016 WL 236241 (N.D. Ill. Jan. 19, 2016)............................................16

*Foxworthy v. Hiland Dairy Co.*,
  997 F.2d 670 (10th Cir. 1993) ...............................................................13

*Galbreath v. Gulf Oil Corp.*,
  413 F.2d 941 (5th Cir. 1969) .................................................................18

*Glanville v. Dupar, Inc.*,
  No. H-08-2537, 2009 WL 3255292 (S.D. Tex. Sept. 25, 2009)................10, 15, 18

*Isquith v. Middle South Utilities, Inc.*,
  847 F.2d 186 (5th Cir. 1988) ...................................................................8

*Kennedy v. Equity Transp. Co., Inc.*,
  663 Fed. Appx. 38 (2d Cir. Sept. 28, 2016)......................................13, 17

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

*Levinson v. Spector Motor Serv.*,
    330 U.S. 649 (1947) ..................................................................................12

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) .......................................................................8

*Matsushita v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ....................................................................................8

*Musarra v. Digital Dish, Inc.*,
    454 F.Supp.2d 692 (S.D. Ohio Sep 28, 2006) ..........................................15

*Roberts v. Leonard W. Levine*,
    921 F.2d 804 (8th Cir. 1990) .....................................................................17

*SEC v. Recile*,
    10 F.3d 1093 (5th Cir. 1993) .......................................................................9

*Shew v. Southland Corp.*,
    370 F.2d 376 (5th Cir. 1966) .....................................................................18

*Siller v. L&F Distribs., Ltd.*,
    109 F.3d 765 (5th Cir. 1997) (per curiam) (unpublished) ....................12, 14, 15, 16

*State Farm Life Ins. Co. v. Gutterman*,
    896 F.2d 116 (5th Cir. 1990) .......................................................................8

*State of Tex. v. United States of Am. & Interstate Commerce Comm'n*,
    866 F.2d 1546 (5th Cir. 1989) ...................................................................13

*Talton v. I.H. Caffey Distrib. Co., Inc.*,
    124 F. App'x 760 (4th Cir. 2005) ..............................................................15

*Tomlin v. JCS Enters., Inc.*,
    13 F.Supp.3d 1330 (N.D. Ga. 2014) ..........................................................12

*Walling v. Jacksonville Paper Co.*,
    317 U.S. 564 (1943) ..................................................................................13

**Statutes**

29 U.S.C. § 201 ...............................................................................................1

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

29 U.S.C. § 207(a)(1) ...................................................................................................9

29 U.S.C. § 213(b)(1) ...................................................................................................9

49 U.S.C. § 13102(15) .................................................................................................11

49 U.S.C. § 13102(15)(B)-(C) .....................................................................................11

49 U.S.C. § 31132(1)(A) ..............................................................................................11

49 U.S.C. §§ 31502, 13501 ...........................................................................................9

Fair Labor Standards Act .....................................................................................9, 10, 19

Motor Carrier Act ................................................................................................... *passim*

**Other Authorities**

20 C.F.R. § 782.2(b)(1) ...............................................................................................12

29 C.F.R. § 782.2(a) ....................................................................................................10

49 C.F.R. §§ 391.11-391.15 ..........................................................................................3

49 C.F.R. §§ 391.21-391.22 ..........................................................................................3

49 C.F.R. §§ 391.21-391.27 ..........................................................................................3

49 C.F.R. §§ 391.41-391.49 ..........................................................................................3

49 C.F.R. §391.51(a) ..............................................................................................11, 12

49 C.F.R §395 ..............................................................................................................11

49 C.F.R. § 396.11 .........................................................................................................4

FED. R. CIV. P. 56 ..........................................................................................................8

FED. R. CIV. P. 56(c) ......................................................................................................8

FED. R. CIV. P. 56(e) ......................................................................................................8

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **JOHN RICHARD HENDESON,** | § | |
| **Individually And On Behalf of Similarly** | § | |
| **Situated Individuals,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:16-CV-01761** |
| | § | |
| **WOODGRAIN MILLWORK, INC. d/b/a** | § | |
| **WOODGRAIN DISTRIBUTION,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT WOODGRAIN'S MOTION FOR SUMMARY JUDGMENT

Defendant Woodgrain Millwork, Inc. d/b/a Woodgrain Distribution ("Woodgrain") moves for summary judgment on Plaintiffs' claims, and respectfully shows the Court as follows:

## I. SUMMARY OF THE ARGUMENT

Summary judgment should be entered against Plaintiffs John Henderson and Randy Flores on their claim for overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), because they are exempt from the overtime pay provisions by virtue of the Motor Carrier Act exemption. Woodgrain is a motor private carrier, and Plaintiffs' activities as a delivery driver directly affected the safety of motor vehicles in interstate commerce. Specifically, Plaintiffs' delivery of mouldings, doors, and stair parts that originated outside the state of Texas to Woodgrain's retail customers in Texas was part of a practical continuity of movement across state lines. Accordingly, Woodgrain is entitled to summary judgment as a matter of law.

## II.       STATEMENT OF FACTS

**A.       Defendant Woodgrain Distribution**

1.       Defendant Woodgrain is a logistics company that distributes various mouldings and millworks products. (Sellers Dec.[1] ¶ 4).

2.       Woodgrain is authorized by the U.S. Department of Transportation ("DOT"), Federal Motor Carrier Safety Administration ("FMCSA") under Motor Carrier Number: 390608 as a common carrier.  (Sellers Dec. ¶ 5).

3.       Woodgrain has been authorized by the DOT, FMCSA, to engage in transportation as a common carrier of property by motor vehicle in interstate or foreign commerce since at least 1975. (Sellers Dec. ¶ 6).

4.       Woodgrain holds USDOT Number 333781 and is listed by the FMCSA as an interstate carrier. (Sellers Dec. ¶ 7).

5.       While operating in the United States, Woodgrain is required to comply with all U.S. Federal Motor Carrier Safety Regulations ("FMCSRs") and Federal Motor Vehicle Safety Standards. (Sellers Dec. ¶ 8).

6.       During the relevant period, Woodgrain performed both in-state and out-of-state transportation services. (Sellers Dec. ¶ 9; Sellers Dep.[2] 39:20-40:3).

**B.       Plaintiff's Employment as Truck Drivers**

7.       Plaintiffs were delivery drivers during the relevant period of their employment. (Plaintiffs' First Amended Collective Action Complaint ("Am. Compl."), ECF No. 25, at ¶ 17).

8.       During the relevant period of their employment, Plaintiffs drove commercial

---

[1] Declaration of Dale Sellers, executed June 20, 2017, is attached as Exhibit A.
[2] Excerpts from the Deposition Transcript of Dale Sellers are attached as Exhibit B.

trucks weighing more than 10,001 pounds.   (Henderson Dep.[3] 11:21-25; Flores Dep.[4] 55:14-19; Sellers Dec. ¶ 10; Sellers Dep. 55:3-21).

9.      Plaintiffs Flores and Henderson were paid hourly and, in addition, approximately $4.00 for each stop.  (Flores Dep. 23:13-17; Henderson Dep. 39:3-4).

10.      Plaintiffs were required to meet all applicable DOT requirements and FMCSRs prior to assuming their driving duties.  (Sellers Dec. ¶ 8).

11.      Plaintiffs were required to have—and did have—a valid Class A Commercial Driver's License ("CDL").  (Henderson Dep. 11:13-15; Flores Dep. 55:5-8).  A Class A CDL allowed Plaintiffs to drive any combination of vehicles with a combined gross vehicle weight rating of 26,001 pounds or more, if the gross vehicle weight rating of the vehicle or vehicles being towed is in excess of 10,001 pounds.  (Sellers Dec. ¶ 10).

12.      Plaintiffs were required to meet—and did meet—the driver qualifications requirements of, *inter alia*, Part 382 and 391 of the FMCSRs.  (Henderson Dep. 41:19-42:16). These include: (1) meeting the general qualification for commercial truck drivers, as outlined in 49 C.F.R. §§ 391.11-391.15 and Flores Dep. Ex. 7[5] (Flores Dep. 103:19-105:11; Sellers Dec. ¶ 8); (2) submitting to the background and character investigations, as outlined in 49 C.F.R. §§ 391.21-391.27 (Flores Dep. 101:9-14; Sellers Dep. 53:24-54:18; Sellers Dec. ¶ 8); (3) submitting to a road test or its equivalent, as required in 49 C.F.R. §§ 391.21-391.22 (Flores Dep. 57:5-19; Henderson Dep. 49:22-50:6, 50:18-2, Ex. 5; Sellers Dep. 56:17-21; Sellers Dec. ¶ 8); and (4) submitting to physical qualifications and examinations, including drug testing, as outlined in 49

---

[3] Excerpts from the Deposition Transcript of John Henderson are attached as Exhibit C.
[4] Excerpts from the Deposition Transcript of Randy Flores are attached as Exhibit M.
[5] References to exhibits to each Plaintiff's deposition testimony are indicated by Plaintiff's last name and the exhibit number: "[Last Name] Dep. Ex. __."  Plaintiffs' deposition exhibits are attached as Exhibits D-L and N-V.

C.F.R. §§ 391.41-391.49 (Henderson Dep. 47:25-48:17, Exs. 4, 13; Flores Dep. 53:1-54:8, 59:22-61:12, 118:12-119:2, Exs. 3, 4; Sellers Dep. 54:6-11; Sellers Dec. ¶ 8).

13.     Upon hire, Plaintiffs were issued the FMCSRs Pocketbook.   Each driver acknowledged receipt of the Pocketbook and was required to keep a copy of it in his or her possession while driving.  (Sellers Dec. ¶ 14; Flores Dep. 108:14-109:18, Ex. 8; Henderson Dep. 52:19-54:2, Ex. 7).

14.     At the time of hire, all Woodgrain truck drivers participate in a new Hire Safety Orientation.  As part of this Orientation, each truck driver is notified that they were "required to know and comply with the Federal Motor Carrier Safety Regulations."   (Sellers Dec. ¶ 14; Sellers Dep. 56:10-21; Henderson Dep. 52:23-54:2, Ex. 7; Flores Dep. 108:14-109:18, Ex. 8).

15.     After they were hired, Plaintiffs likewise were required to comply with FMCSRs related to recording their hours of service and safety inspections.  (Sellers Dec. ¶ 11; Sellers Dep. 23:2-8, 54:21-55:2, 55:24-56:9; Flores Dep. 62:4-11, 143:6-8; Henderson Dep. 40:23-41:1).

16.     Specifically, Plaintiffs were required to record their duty status in accordance with the recordkeeping requirements of Part 395 of the Federal Motor Carrier Safety Regulations.  Plaintiffs completed daily logs, recording their hours of service.  (Sellers Dec. ¶ 11; Sellers Dep. 23:2-8, 54:21-55:2; Henderson Dep. Ex. 6; Flores Dep. 64:3-8).

17.     Primarily, Plaintiffs used an automatic on-board recording device in their trucks to record hours, in place of a paper logbook.  Xata Corporation provides the software for the automatic on-board recording device used by Plaintiffs.  The commercial name of the recording device used by Plaintiffs was M-75, Handheld device.  (Henderson 66:2-3; Flores Dep. 64:3-8; Sellers Dec. ¶ 12; Sellers Dep. 22:25-23:23).

18.     Plaintiffs were also required to complete—and did complete—pre-trip and post-trip driver vehicle inspections and prepare inspection reports pursuant to Part 396 of the FMCSRs, specifically 49 C.F.R. § 396.11. (Sellers Dec. ¶ 13; Sellers Dep. 55:23-56:9; Henderson Dep. 41:9-14; Flores Dep. 67:25-68:5, Ex. 30 at 3 (Resp. to Def.'s Interrog. No. 2)).

## C.     <u>Woodgrain's Interstate Distribution Operations</u>

19.     As part of their distribution operations, Woodgrain purchases and distributes general mouldings, boards, prefinished mouldings, coated mouldings, doors, and stair parts to their customers.  (Sellers Dec. ¶ 4).

20.     Woodgrain purchases these products from Argentina, Brazil, Canada, Chile, New Zealand, Mexico and the United States.  (Sellers Dec. ¶ 15; Sellers Dep. 56:25-57:4).  The products purchased in the United States are manufactured in various states, including Georgia, North Carolina, Ohio, California, Missouri, and Alabama.  (Sellers Dec. ¶ 16; Sellers Dep. 56:25-57:10).  Plaintiffs admit "[Woodgrain's] items were produced for interstate commerce or actually traveled in interstate commerce."  Am. Compl. at ¶20.

21.     Truck drivers transport the products from either a United States port—if the products are imported from outside the country—or from a manufacturer located in the United States across state lines.  (Sellers Dep. 57:11-21).

22.     Drivers transported products to customers on tractor-trailers. (Sellers Dec. ¶ 10; Sellers Dep. 51:9-11).

23.     In 2013, Woodgrain purchased approximately 56,766,688 units for its Houston Distribution Center.  Of those units, approximately 55,031,068 units were transported across state lines or from foreign shores to the Houston Distribution Center.  (Sellers Dec. ¶ 17).

24.     In 2014 and 2015 combined, Woodgrain purchased approximately 198,648,110 units for its Houston Distribution Center.  Of those units, approximately 192,496,050 units were

transported across state lines or from foreign shores to the Houston Distribution Center.  (Sellers Dec. ¶ 18).

25.     In 2016, Woodgrain purchased approximately 124,617,096 units for its Houston Distribution Center.  Of those units, approximately 121,957,568 units were transported across state lines or from foreign shores to the Houston Distribution Center.  (Sellers Dec. ¶ 19).

26.     Woodgrain controls the products when they are shipped from the manufacturer to its distribution centers.  (Sellers Dec. ¶ 20).

27.     Woodgrain controls the products while they are in the Houston Distribution Center and also controls the subsequent transportation of the products to its customers.  (Sellers Dec. ¶ 21; Sellers Dep. 58:4-13).

28.     Woodgrain bears the costs of the shipment of the products from the manufacturers.  (Sellers Dec. ¶ 22).

29.     Woodgrain owns the Houston Distribution Center.   (Sellers Dec. ¶ 23; Sellers Dep. 59:12-14).

30.     The amount Woodgrain orders typically is based on historical sales data.  Woodgrain collects data on the products from each sales order, and the data is input into a central database that analyzes past sales to predict future customer needs.  The database forecasts the amount of products needed on a 26-week basis to fulfill orders with customers based on standing orders, historical orders and customer buying patterns.  (Sellers Dec. ¶ 24; Sellers Dep. 59:17-21).

31.     Woodgrain also order products based on its understandings with customers.  For example, Woodgrain is required to maintain a 99 percent fulfill rate with some clients.  That means, if one such client orders any amount of moulding or other products, Woodgrain must be

able to fulfill at least 99 percent of that order.  (Sellers Dec. ¶ 25; Sellers Dep. 59:2-8, 62:22-63:2).

32.     From 2013 to 2016, products typically were shipped directly to customers between 40 to 62 days after the products' arrival at the Houston Distribution Center.  However, some products were shipped to customers more quickly, including within the same day as the products' arrival at the Houston Distribution Center.  (Sellers Dec. ¶ 26; Sellers Dep. 59:2-8).

33.     The products are not altered in any way before they are delivered to the customer.  (Sellers Dec. ¶ 27; Sellers Dep. 58:11-17).  For products that arrive in large bundles, called "master units," Woodgrain may subdivide the master units into smaller bundles for delivery, but the actual products are not altered in any way.  (Sellers Dep. 58:14-23).

### D.     The Specific Plaintiffs

34.     <u>John Henderson</u>.  Woodgrain hired Henderson in 1998.  He worked as a truck driver until his voluntary resignation on June 10, 2016.  (Henderson Dep. 7:21-8:1, 24:24-25:10).

35.     Before starting his employment with Woodgrain as a truck driver, Henderson completed all of the requirements to be qualified as a truck driver under USDOT regulations, including providing a medical examiner's certificate, completing a driver's road test examination, consenting to an alcohol and drug background check, providing a driver data sheet, and consenting to an annual review of his driving record, all pursuant to the FMCSRs.  (Henderson Dep. 41:19-42:16, 47:25-48:17, 49:22-50:6, Exs. 4-5, 9-13.)   Henderson also received a copy of the FMCSRs Pocketbook, which he kept with him at all times while driving.  (Henderson Dep. 52:19-54:23:14, Ex. 7).

36.     <u>Randy Flores</u>.  Flores began working for Woodgrain in June of 2007; he is currently a truck driver with Woodgrain.  (Flores Dep. 39:3-13)

37.     Before starting his employment with Woodgrain as a truck driver, Flores completed all of the requirements to be qualified as a truck driver under USDOT regulations, including providing a medical examiner's certificate, completing a driver's road test examination, consenting to an alcohol and drug background check, consenting to a driving background check, providing driver data sheet, and consenting to an annual review of his driving record, all pursuant to the FMCSRs.  (Flores Dep. 53:1-54:8, 57:5-19, 59:22-61:12, 103:19-105:11, 101:9-14, 118:12-119:2, Exs. 3-4, 8, 10-14).  Flores also received a copy of the FMCSRs Pocketbook.  (Flores Dep. 109:16-109:18, Ex. 8).

### III.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under FED. R. CIV.  P. 56, when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits presented, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   A dispute about a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," the non-movant must come forward with significant probative evidence showing a triable issue of fact.  *Celotex*, 477 U.S. at 325 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); FED. R. CIV. P. 56(e); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990).

Where the moving party has met its Rule 56(c) burden, the non-movant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.  *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5th Cir. 1988).  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he

nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'"  *Matsushita v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (quoting FED. R. CIV. P. 56(e)) (emphasis in original); *Celotex Corp.,* 477 U.S. at 322-23.

Conclusory allegations and denials, self-serving characterizations, speculation, improbable inferences, unsubstantiated assertions, and legalistic arguments are not adequate substitutes for specific facts showing that there is a genuine issue for trial.  *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428 (5th Cir. 1996) (en banc); *SEC v. Recile,* 10 F.3d 1093, 1097 (5th Cir. 1993).  A mere scintilla of evidence is not sufficient; rather, the non-movant must present sufficient evidence upon which a jury could reasonably find in the non-movant's favor. *Id.*

## IV.    ARGUMENT AND AUTHORITIES

### A.    Plaintiffs Are Exempt from the Overtime Provisions of the FLSA Pursuant to the Motor Carrier Act Exemption of Section 213 (b)(1).

The FLSA generally entitles employees to overtime pay for hours worked in excess of 40 per week.  29 U.S.C. § 207(a)(1).  One exception to the FLSA's overtime requirements is the Motor Carrier Act ("MCA") exemption, contained in Section 13(b)(1) of the FLSA.  29 U.S.C. § 213(b)(1).  The exemption provides that the FLSA's overtime requirements do not apply to employees "whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49."  *Id.*; *Barefoot v. Mid-Am. Dairymen, Inc.*, 826 F. Supp. 1046, 1049 (N.D. Tex. 1993) *aff'd*, 16 F.3d 1216 (5th Cir. 1994).  The Secretary of Transportation has the power to regulate employees of motor carriers whose duties affect highway safety when interstate shipments are involved.  49 U.S.C. §§ 31502, 13501; *Billings v. Rolling Frito-Lay Sales, L.P.*, 413 F. Supp. 2d 817, 820 (S.D. Tex. 2006).  This includes drivers who transport goods as part of a continuous movement in interstate

commerce and as well as drivers who do not cross state lines.  In fact, *employees are exempt* if they drive on an intrastate segment or leg of a continuous movement of goods in interstate commerce.  *Billings*, 413 F. Supp. 2d at 820 (applying the MCA exemption and denying overtime compensation to route sales representatives who transported products manufactured out of state from the Texas distribution center to Texas retailers, even though the legs of the route sales representatives' journey were "entirely intrastate"); *Bradford, et al., v. GG Distrib., LLC*, No. 2:14-CV-692- RSP, 2016 WL 951762 (E.D. Tex. Mar. 12, 2016) (applying the MCA exemption to delivery drivers who distributed products solely within Texas);  *Glanville v. Dupar, Inc.*, No. H-08-2537, 2009 WL 3255292 (S.D. Tex. Sept. 25, 2009) (applying the MCA exemption to delivery drivers who distributed out-of-state products within Texas).

"The exemption of an employee from the hours provisions of the Fair Labor Standards Act under section 13(b)(1) depends both on the class to which his employer belongs and on the class of work involved in the employee's job."  29 C.F.R. § 782.2(a).  The Secretary of Transportation's authority, and thus the MCA exemption, applies to those classes of employees who are:  (1) employed by carriers whose transportation of . . . property by motor vehicle is subject to the Secretary's jurisdiction under the MCA;  and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the MCA.  29 C.F.R. § 782.2(a); *Billings,* 413 F.Supp.2d at 820; *Barefoot,* 826 F. Supp. at 1049.  In the present case, Plaintiffs fall within both requirements, which subject them to the power of the Secretary of Transportation and thereby exempt Woodgrain from paying overtime compensation to Plaintiffs.

**B.**     **Woodgrain Is a Motor Carrier.**

A "motor private carrier" is a person, other than a motor carrier, transporting property by commercial motor vehicle (as defined in section 31132) when – (A) the transportation is as provided in section 13501 of the MCA; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial purpose.  *See* 49 U.S.C. § 13102(15).  Section 31132, in turn, defines a commercial motor vehicle as a "self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle – (A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater."  49 U.S.C. § 31132(1)(A).

 In the present case, there is no dispute that Woodgrain transports property by "commercial motor vehicle."   Specifically, Woodgrain transports products to customers primarily on tractor-trailers.  *See* Statement of Facts ("SOF") ¶ 22; *see also* Am. Compl. at ¶¶ 25-27 (Plaintiffs Henderson's and Flores' jobs were to "pick up the loaded trailer" of "wood products" and make deliveries to Woodgrain customers).  Plaintiffs concede that they drove 18-wheel trucks on the highways and that these trucks had a gross vehicle weight of at least 10,001 pounds.  *See* SOF ¶ 8.

In addition, there is no dispute that Woodgrain is the owner of the products it transports to its customers, and that it sells these products to further a commercial purpose, *i.e.*, to increase its sales and revenues.  *See* 49 U.S.C. § 13102(15)(B)-(C); SOF at ¶¶ 19-20.

Furthermore, Woodgrain is regulated by the Secretary of Transportation.   Woodgrain is required to register, and is registered, with the FMCSA.  SOF at ¶¶ 2-4. Operating under DOT Number 333781, Woodgrain is registered as a private motor carrier.  *See id*.  Woodgrain requires that its drivers comply with the FMCSRs.   *See id*. at ¶¶ 10-18.   Woodgrain schedules and

monitors the service hours of its drivers so that the hours are in compliance with the detailed hours of service regulations governing drivers of vehicles in interstate commerce operations in 49 C.F.R §395.  *See id*.  Woodgrain maintains all required DOT records and maintains a "driver qualification" file for each driver as required and defined by 49 C.F.R. §391.51(a).  *See id*.  Additionally, Woodgrain drivers are required to submit to pre-hire physical examinations, as well as pre-hire and random drug and alcohol testing pursuant to the FMCSRs.  *See id.* And, drivers are required to conduct daily pre-trip and post-trip vehicle inspections.  *See id.*

## C.    <u>Plaintiffs Were Drivers Who Directly Affected Highway Safety</u>.

It is undisputed that Plaintiffs were engaged in duties affecting highway safety on a continuing basis.  Plaintiffs admit they were both truck drivers, whose job duties included driving commercial motor vehicles—vehicles weighing more than 10,000 lbs. —to pick up and deliver moulding and other materials to Woodgrain's customers.  *See id*. at ¶ 8; Am. Compl. at ¶¶ 25-27 (Plaintiffs Henderson's and Flores' jobs were to "pick up the loaded trailer" of wood products and make deliveries to Woodgrain customers).  A "driver" is an occupation that directly affects the safety of motor vehicles.  *See* 20 C.F.R. § 782.2(b)(1).  Furthermore, both the Supreme Court and lower courts have ruled that truck drivers, as a matter of law, affect highway safety.  *See, e.g., Levinson v. Spector Motor Serv.*, 330 U.S. 649, 666-68 (1947); *Barefoot*, 826 F. Supp. at 1050; *Tomlin v. JCS Enters., Inc.*, 13 F.Supp.3d 1330, 1337 (N.D. Ga. 2014) (holding plaintiff's job duties affected highway safety because it was undisputed he was employed as a commercial truck driver, he drove defendant's trucks on public highways, and performed safety inspections of the trailers).  Accordingly, Plaintiffs were engaged in duties that affected highway safety as a matter of law.

D.      __Plaintiffs Transported Goods in Interstate Commerce__.

An employee is engaged in interstate commerce even if his or her duties require the intrastate transport of goods so long as the goods remain in the flow of interstate commerce. *Siller v. L&F Distribs., Ltd.*, 109 F.3d 765, 765 (5th Cir. 1997) (per curiam) (unpublished) (quoting *Merchs. Fast Motor Lines, Inc. v. I.C.C.*, 528 F.2d 1042, 1044 (5th Cir. 1976)).   In reaching this conclusion, federal courts have applied the "practical continuity of movement" test set forth in *Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943).  Under this test, "if there is a practical continuity of movement from the manufacturers or suppliers without the state, through [the employer's] warehouse and on to customers whose prior orders or contracts are being filled, the interstate journey is not ended by reason of a temporary holding of the goods at the warehouse."  *Badgett v. Rent-Way*, 350 F. Supp. 2d 642, 647 (W.D. Pa. 2004).  "Transportation [of a product] within a single state may remain 'interstate' in character when it forms a part of a 'practical continuity of movement' across state lines from the point of origin to the point of destination."  *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir. 1993) (quoting *Walling*, 317 U.S. at 568).  The "characterization of transportation between two points in a State as interstate or intrastate in nature depends on the 'essential character' of the shipment.  Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting *intent at the time of shipment*."  *State of Tex. v. United States of Am. & Interstate Commerce Comm'n*, 866 F.2d 1546, 1556 (5th Cir. 1989) (emphasis in original); *accord Kennedy v. Equity Transp. Co., Inc.*, 663 Fed. Appx. 38, 40 (2d Cir. Sept. 28, 2016) (explaining whether intrastate transportation was part of a continuous interstate journey rested on if "the shipper had a 'fixed and persisting transportation intent' to move the products *beyond the storage facility* at the time of shipment") (emphasis added).

The totality of all facts and circumstances determines whether a shipper has the requisite intent to move goods continuously in interstate commerce. *State of Tex.*, 866 F.2d at 1560.  The Fifth Circuit considers the following factors as guides to determine the interstate character of a product: (1) whether a single shipper has control over both the inbound and outbound movements to and from the warehouse; (2) whether the shipments are made pursuant to specific orders or customer estimates of need that predict how much product will eventually be delivered to each customer; (3) how many customers the storage facility serves; (4) how rapidly the product moves through the storage facility; (5) whether the shipment is made pursuant to a storage-in-transit provision in an appropriate tariff; and (6) whether the product goes through additional processing or manufacture at the storage facility. *Siller*, 109 F.3d at 765 (quoting *Merchs. Fast Motor Lines, Inc.*, 528 F.2d at 1044; *Central Freight Lines v. I.C.C.,* 899 F.2d 413, 420 (5th Cir. 1990)).

Considering the above factors, it is apparent Plaintiffs are heavily involved in interstate commerce.  Plaintiffs do not dispute this and admit that "**[Woodgrain's] items were produced for interstate commerce or actually traveled in interstate commerce.**"  Am. Compl. at ¶ 20 (emphasis added).

1.   <u>Woodgrain controls the products and owns the distribution center.</u>

Woodgrain controls the products when they are shipped from the manufacturers to the Houston Distribution Center.   SOF ¶ 26.  Woodgrain further controls the products while they remain in the Houston Distribution Center and controls the subsequent transportation of the products to its customers.  SOF ¶ 27.  Moreover, Woodgrain also bears the costs of the shipment of the products from the manufacturers, both by paying for transportation charges for delivery to the Houston Distribution Center and by employing drivers to deliver the products to local customers.  SOF ¶ 28.  And it owns the Houston Distribution Center.  SOF ¶ 29.

      2.    <u>Woodgrain's orders are based on historical data and understandings with the customers.</u>

Woodgrain's orders are based upon historical sales data and customer understandings. SOF at ¶ 30.  Woodgrain's drivers, including Plaintiffs, collect data on the products from each sales order, and the data is input into a central database that analyzes past sales to predict future customer needs.  SOF at ¶ 30.  Woodgrain also has understandings with its large customers to have enough products in its Distribution Center to fulfill basically any and all orders.  SOF at ¶ 31.  Courts have applied the MCA exemption under similar circumstances when the shipments are made based on anticipated demand, even in the absence of specific orders.  *See, e.g.*, *Siller*, 109 F.3d at 765 (holding the MCA exemption applied where distributors ordered products based on sales projections);  *Billings*, 413 F. Supp. 2d at 821 (holding the MCA exemption applied where the shipper did not know in advance the ultimate destination of particular products and stocked its warehouse based on "projections of customer demand with some factual basis");  *Bradford*, 2016 WL 951762, at *2 (applying the MCA exemption where defendant's drivers had a clear understanding with the retailers, based on the instructions of the retailers and on the recorded history of their sales, on how much product would be needed at any given time by a given retailer); *Glanville*, 2009 WL 3255292, at *12 (applying the MCA exemption where GE transported appliances to a Dallas distribution center based on forecasts of sales, specific customer orders, and an "understanding" with its larger customers about the appropriate amount of appliances to satisfy customer demand); *Musarra v. Digital Dish, Inc.*, 454 F.Supp.2d 692, 713 (S.D. Ohio Sep 28, 2006) (holding the MCA exemption applied where DISH Network shipped equipment to nationwide distribution centers based on forecasts of demand, and local delivery drivers delivered goods to the consumers after the order was made); *see also Talton v. I.H. Caffey Distrib. Co., Inc.*, 124 F. App'x 760, 765 (4th Cir. 2005) (holding the MCA

exemption applied where a malt beverage and wine wholesaler/distributor estimated retailers' needs by either talking to the retailer managers or analyzing sales data, and holding the distributor had an "understanding" with the retailers).

3.    <u>Woodgrain's products have a quick turnaround time from warehouse delivery to customer delivery.</u>

Woodgrain's intent to move products continuously in interstate commerce is further demonstrated by the fact that products are not altered in any way once they arrive at the Houston Distribution Center. *See* SOF ¶ 33. Woodgrain repackages products that arrive in large bundles into smaller bundles, but such repackaging does not constitute alteration. *See, e.g.*, *Billings*, 413 F.Supp.2d at 821 (quoting DEP'T OF TRANSP., Motor Carrier Interstate Transportation–From Out-of-State Through Warehouses to Points in Same State, 56 FR 19812-01, 1992 WL 93608 (May 8, 1992)) ("repackaging (secondary packaging) may be performed" without altering the product); *Edwards v. Aramark Uniform & Career Apparel, LLC*, 2016 WL 236241, at * 10 (N.D. Ill. Jan. 19, 2016) (quoting DEP'T OF LABOR, Field Operations Handbook, § 24c02, 24d00) ("'a modification that does not change the nature of the product is insufficient to create a break in that product's interstate journey.'").

In addition, the products are stored only briefly at the distribution center before they are shipped. *See* SOF ¶ 32. This fact further demonstrates the distribution center is merely an intermediate step in the process of getting the products to their final destinations. *See Aramark Uniform*, 2016WL 236241, at *10 (emphasizing defendant did not purchase products "with the intention of letting the goods sit in the warehouse with no designated destination"). As such, the products are still in interstate commerce until they reach the customer. *See Siller,* 109 F.3d at 765 (holding delivery of goods stored at an in-state warehouse between 6 to 28 days before being delivered to consumer was interstate; "placing goods in a warehouse interrupts, but does not

necessarily terminate the goods' interstate journey"); *see also Collins v. Heritage Wine Cellars, Ltd.*, No. 07-cv-1246, 2008 WL 5423550, at *18 (N.D. Ill. Dec. 29, 2008) (holding 1-month storage period in the company's warehouse was not indefinite and was "insufficient to break continuity"); *Roberts v. Leonard W. Levine,* 921 F.2d 804, 814 (8th Cir. 1990) (holding 6-month storage period in the company's warehouse did not disrupt the company's fixed and persistent intent that the product continue in interstate commerce to its customers).  The Second Circuit recently analyzed a case with substantially similar facts, where a driver contended his purely intrastate route of taking trailers of products from a bottling plant to a compound did not involve interstate commerce because the next driver took the products to a warehouse before further distribution.  *See Kennedy*, 663 Fed. Appx. at 40.  The Court of Appeals noted the plaintiff "misread[ ]" the cited cases as stating that shipment to a warehouse is not "interstate" under the MCA exemption "if the shipper intends to store the products at the warehouse for inventory purposes." *Id.*  Instead, the real question was whether the products had "'come to rest' at the storage facility," or whether the shipper had a "'fixed and persisting transportation intent' to move the products beyond the storage facility at the time of shipment." *Id.* (quoting *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1155 (10th Cir. 2016)).  The Second Circuit found the district court correctly concluded the MCA exemption applied because, even though the driver "may never have personally transported a trailer across state lines, when he relayed filled trailers to the Exit 24 compound, he was essentially 'one leg of a route to an out of state destination.'" *Id.* (internal quotations omitted).  The Second Circuit's conclusions apply with equal force to Plaintiffs, whose intrastate routes were just one leg of a continuous interstate journey where Woodgrain intended at the time of shipment to move its products beyond its distribution centers, including the Houston Distribution Center. *See id.*

4.    The products are still in interstate commerce even though there is no storage-in-transit provision.

While there is no storage-in-transit provision, the absence of this factor is insufficient to establish that the continuity of interstate commerce is broken at the Houston Distribution Center. *See Billings*, 413 F.Supp.2d at 822 (quoting *Roberts v. Levine,* 921 F.2d 804 (8th Cir. 1990); Opinion Letter-Fair Labor Standards Act, 2005 WL 330602 (Dep't of Labor Jan. 11, 2005); DEP'T OF TRANSP., Motor Carrier Interstate Transportation–From Out-of-State Through Warehouses to Points in Same State, 56 FR 19812-01, 1992 WL 93608 (May 8, 1992)).

Reinforcing that the above factors show Plaintiffs' involvement in interstate commerce, this case mirrors the many cases where the Fifth Circuit and district courts in this circuit have ruled that intrastate deliveries are interstate commerce if the goods originated out of state and if the intrastate delivers are simply the final phase of interstate transportation. *See, e.g.*, *Merchants Fast Motor Lines,* 5 F.3d at 917 (holding local drivers operate in interstate commerce "when a shipper ships goods into Texas from another state, temporarily stores the goods at a warehouse in Texas, then later ships the goods to the shipper's Texas customer" using local delivery drivers); *Galbreath v. Gulf Oil Corp.,* 413 F.2d 941, 942, 947 (5th Cir. 1969) (finding the MCA exemption applied to drivers who performed solely intrastate transportation of petroleum products that originated out of the state); *Shew v. Southland Corp.,* 370 F.2d 376 (5th Cir. 1966) (holding dairy products that originated outside of Texas but stopped temporarily in Dallas were part of a continuous movement in interstate commerce such that the truck drivers who delivered the products locally in Texas were engaged in interstate commerce for purposes of the MCA exemption); *Billings*, 413 F. Supp. 2d 817 (holding the MCA exemption applied to route sales representatives who transported products that were manufactured out of state from the Texas distribution center to Texas retailers, even though the legs of the sales representatives' journey

were "entirely intrastate"); *Bradford*, 2016 WL 951762 (applying the MCA exemption to delivery drivers who distributed products solely within Texas); *Glanville*, 2009 WL 3255292 (applying the MCA exemption to delivery drivers who distributed out-of-state products within Texas). Indeed, in a closely analogous case, this Court held the MCA exemption applied to delivery drivers where Frito-lay manufactured its products throughout the United States, Mexico, and Canada, shipped the products to various distribution centers based on customer demand, and temporarily stored and repackaged the products at the distribution centers, then the drivers picked up the products and delivered them to customers. *Billings*, 413 F. Supp. 2d at 818, 821-22. This Court found such delivery methods established the drivers were "part of interstate commerce even though their legs of the journey were entirely intrastate." *Id.* at 822. The same rings true here.

Plaintiffs and all Woodgrain drivers plainly meet all factors of the test for involvement in interstate commerce. Again, Plaintiffs themselves do not dispute this. *See* Am. Compl. at ¶ 20 ("[t]hese items were produced for interstate commerce or actually traveled in interstate commerce."). As a result, Woodgrain is entitled to judgment as a matter of law.

## V.  CONCLUSION

Woodgrain has not violated the overtime provisions of the FLSA, willfully or otherwise. Woodgrain's drivers are squarely within the parameters of the Motor Carrier Act exemption for the reasons set forth above. Thus, Plaintiffs' lawsuit should be dismissed because Plaintiffs fall within the Motor Carrier Act exemption.

Respectfully submitted,

/s/ Russell R. Zimmerer
Kimberly R. Miers
Texas State Bar No. 24041482
kmiers@littler.com
Russell R. Zimmerer
Texas State Bar No. 24059798
rzimmerer@littler.com

LITTLER MENDELSON, P.C.
A Professional Corporation
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, TX  75201.2931
214.880.8100
214.880.0181 (Fax)

ATTORNEYS FOR WOODGRAIN
WOODGRAIN MILLWORK, INC. d/b/a
WOODGRAIN DISTRIBUTION


## CERTIFICATE OF SERVICE

I certify that on June 20th, 2017, I electronically filed this document with the clerk of court for the U.S. District Court, Southern District of Texas, using the Electronic Case Filing System of the Court:

Trang Q. Tran
Alecia D. Best
Tran Law Firm, L.L.P.
9801 Westheimer Road, Suite 302
Houston, Texas 77042
*Attorneys for Plaintiff*


/s/ Russell R. Zimmerer
Russell R. Zimmerer